**IN THE UNITED STATES EAGLEVILLE COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PAXTON HARRIS<br><br>Plaintiff,<br><br>v.<br><br>THE RESULTS COMPANIES LLC<br>D/B/A RESULTSCX<br><br>Defendants. | : | CIVIL ACTION<br>No.: 26-7286<br><br><br><br><br><br>JURY TRIAL DEMANDED |

CIVIL ACTION COMPLAINT

## I. PRELIMINARY STATEMENT

1. Mr. Paxton Harris (hereinafter "Plaintiff "), had a long, eleven-year career at The Results Companies LLC d/b/a ResultsCX (hereinafter "ResultsCX" or "Defendant"), beginning as a licensed insurance agent in 2015, upwardly moving to various positions due to promotions throughout the years. Mr. Harris brings this action pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. §12101, *et seq.,* 43 P.S. §955(a); and Family Medical Leave Act ("FMLA") to compensate him for injuries he sustained where ResultsCX discriminated against him by refusing to provide him with accommodations for his disability; (2) ResultsCX terminated his employment because of his disability; (3) he was denied mandatory entitlements under the FMLA and; (5) he was subjected to retaliatory termination and revoked healthcare coverage because he invoked his entitlement to benefits under the FMLA. Due to the Defendant's unlawful actions, Plaintiff has suffered financial losses, suffered ill health due to lapses in treatment and emotional distress. Mr. Harris seeks back wages, front pay, benefits, and other emoluments of employment which he lost as a result of Defendant's protracted, intentional

and unlawful employment actions, as well as compensatory damages.

## II. JURISDICTION AND VENUE

2. The Court has jurisdiction over this action pursuant to the Americans with Disabilities Act, 42 U.S.C. §12101, (hereafter "ADA"); and FMLA. Jurisdiction is further predicated upon 28 U.S.C. §1331, this being an action arising under the laws of the United States, and 28 U.S.C. §1343.

3. All of the actions complained of herein took place within the Eastern District of Pennsylvania, and Defendant Harris resides therein.

## III. PARTIES

4. Plaintiff is a citizen of the United States who resides in Philadelphia, Pennsylvania.

5. Plaintiff is a qualified individual with a disability as defined by the ADA.

6. ResultsCX, is a corporation and an employer as defined by the ADA, and the FMLA.

7. ResultsCX principal place of business is located at 1700 Markley St. Suite 210 Norristown, PA 19401.

7. ResultsCX employees more than 50 people.

8. At all times relevant herein, Defendant acted by and through its agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## IV. ADMINISTRATIVE EXHAUSTION

8. On June 2, 2026, Mr. Harris dual filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC") and the Pennsylvania Human

Relations Commission (hereinafter "PHRC") alleging discrimination on the basis of disability. See Charge attached as Exhibit A.

9. On June 24, 2026, Mr. Harris received a Notice of Right to Sue (Dismissal Notice) correspondence from the EEOC. See Notice of Right to Sue attached as Exhibit B.

10. Plaintiff exhausted his administrative remedies and has filed the instant action within the required limits of receiving notice of his right to sue.

## V. FACTUAL ALLEGATIONS

11. In 2015, Mr. Harris was hired as a Licensed Insurance Agent by Defendant.

12. Plaintiff performed his job satisfactorily for over a decade.

13. On August 28, 2023, Plaintiff was diagnosed with Type 1 Diabetes and during all relevant times to the complaint, he suffered continuously from the following symptoms: lightheadedness caused by low blood sugar, frequent urination, intense hunger, intense thirst. Managing his diabetes meant frequent doctor visits, constant monitoring of blood sugar and the self-administering of insulin.

14. More specifically, Plaintiff suffered from a disorder of a major body function - the endocrine system, specifically, involving how the pancreas makes and uses hormones to control blood sugar. Beyond the internal major body function of the endocrine system, Plaintiff's disability affected his ability to eat, sleep, think and concentrate, and work.

15. On October 30, 2024, Plaintiff informed his supervisor, Ms. Jacquelyn Plowick (in a meeting recorded by Defendant) of his intent to use PTO for a doctor's appointment on November 7, 2024.

16. On or around November 4, 2024, Plaintiff contacted his HR representative, Ms.

Elisha Smith, inquiring about FMLA to be used for extra time during breaks, attending doctor appointments and managing his diabetes.

17. On November 7, 2024, Plaintiff used PTO to attend an appointment with his physician.

18. On November 8, 2024, despite notifying Ms. Plowick of his use of PTO for a necessary medical appointment, Plaintiff was issued an attendance write-up for November 7, 2024.

19. On November 8, 2024, Plaintiff complained about the erroneous write-up to Ms. Heather Watson in HR, but it was not removed, and was used to support his Final Warning, issued on June 23, 2025, which led to his termination.

20. On December 18, 2024, Plaintiff submitted his ADA forms completed by his treating physician. For accommodations, Plaintiff and his Physician requested one 45-minute lunch break and three 10-minute breaks. These were needed to manage Plaintiff 's hyper and hypo glycemia, to test blood sugar levels, to eat, to deal with lightheadedness, and to take medication.

21. On January 7, 2025, Plaintiff was notified that his initial ADA accommodations request was approved, this included: one 45-minute lunch break, three 10-minute breaks, and one day per month to attend doctor's appointments.

22. From January 14, 2025, to January 31, 2025, Plaintiff was not able to work due to computer issues and had to be sent new equipment by Defendant in order to resume working. He remained in daily contact with Ms. Plowick as he awaited his equipment. Plaintiff was written up by Ms. Plowick on January 29, 2025, the date his computer finally arrived, for not reporting to work. Plaintiff did not receive notice of delivery, and the computer was left in the common

area of his apartment. He was not aware until later that evening that his new equipment arrived.

23. On February 12, 2025, Plaintiff submitted his FMLA medical certification to Ms. Smith. In that email submission, Plaintiff informed Ms. Smith that, although his ADA accommodation was approved, Defendant was denying him his accommodation. Specifically, Plaintiff was restricted by management from taking his three 10-minute breaks or his extended lunch break by scrutinizing, monitoring, and harassing.

24. On February 13, 2025, Plaintiff requested and was approved for one 45-minute lunch and three 15-minute breaks. Ms. Smith, upon approval, stated that he would have to log off for one of the three 15-minute breaks –it would be unpaid.

25. Despite Plaintiff alerting Ms. Smith about management not putting into place his new schedule, Plaintiff continued to be denied reasonable accommodation as his schedule remained unchanged until July18, 2025. From March until July 2025, Plaintiff was both restricted and harassed for taking his approved breaks, receiving texts, emails, and calls to complain by Ms. Plowick and others. Plaintiff often avoided, and seldom used or exercised his right to take the extra breaks due to the heightened scrutiny and harassment by Ms. Plowick.

26. On March 7, 2025, Ms. Smith informed Plaintiff that his intermittent FMLA was approved on March 4, 2025.

27. On March 20, 2025, Plaintiff began to receive messages from Ms. Plowick hounding him and harassing him about exercising his right to take his ADA approved breaks. This continued on/through March 20, 2025; April 29, 2025; May 7, 2025; and June 6, 2025. Instead of implementing the change in schedule, Defendants kept Plaintiff in for the standard 2 15-minute break schedule that everyone else followed.

28. On May 12, 2025, Ms. Plowick complained to Plaintiff that he did not call out for

time (2 hours) used for managing his medical condition. Plaintiff did in fact call out and was approved for FMLA use by the Leave Administrator.

29. On May 16, 2025, Ms. Plowick complained to Plaintiff that he did not call out for time (2 hours) used for managing his medical condition. Plaintiff did in fact call out, and was approved for FMLA use by the Leave Administrator.

30. On May 19, 2025, Ms. Plowick complained to Plaintiff that he did not call out for time (2 hours) used for managing his medical condition. Plaintiff did in fact call out and was approved for FMLA use by the Leave Administrator.

31. On June 6, 2025, Ms. Plowick complained to Plaintiff that he did not call out for time (2 hours) used for managing his medical condition. Plaintiff did in fact call out and was approved for FMLA use by the Leave Administrator.

32. On June 18, 2025, Plaintiff called the Leave Admin line to inform them that he was feeling ill and requested FMLA. It was approved (for 8 hours).

33. On June 19, 2025, Plaintiff emailed Ms. Smith to inform her that he received a notice stating that his healthcare was being discontinued due to a reduction of hours. This violated company policy which stated that: "During an approved family medical leave, the company will maintain the employee's health benefits as if the employee continued to be actively employed."

34. On June 19, 2025, Ms. Smith replied, stating that Plaintiff must maintain a minimum of 30 hours a week in order to maintain health coverage. She asked if Plaintiff was correctly reporting to ADP and to the prescribed attendance line his FMLA events.

35. On June 19, 2025, Plaintiff replied to Ms. Smith stating that he was reporting to the Leave Admin and asked if there was any policy stating that he must meet the minimum 30-

hours a week while on FMLA.

36. On June 20, 2025, Ms. Smith informed Plaintiff that he could look for information about FMLA policy in the Employee Handbook. She then stated that she could look at Plaintiff's call outs to see if there were any that were not reported to ADP.

37. On June 23, 2025, Plaintiff received a write-up from Ms. Plowick, for failure to call out on June 18, 2025. Plaintiff did inform the Leave Admin that he was feeling ill and was approved for 8 hours of FMLA. Plaintiff was placed on Final Warning for this event.

38. On June 25, 2025, Plaintiff replied to Ms. Smith citing company policy which stated that: "During an approved family medical leave, the company will maintain the employee's health benefits as if the employee continued to be actively employed." By canceling Plaintiff 's benefits, Defendant violated its own policy.

39. Plaintiff, while using his FMLA/ADA time off, was subjected to increased scrutiny and difficulty by Defendant.

40. On July 3, 2025, Ms. Plowick wrote Plaintiff up for "verbiage," specifically for using phrases like, "alright" or "I gotcha," which she considered unprofessional. This, again, evidenced the overly excessive scrutiny Plaintiff received from Ms. Plowick, and would contribute to his final warning, and eventual termination.

41. On July 22, 2025, Ms. Plowick informed Plaintiff that she was unable to see a call out from him and that it was considered a "no call, no show." Plaintiff did in fact call out on this day and was approved for (4 hours) FMLA.

42. On July 31, 2025, Ms. Smith reminded Plaintiff that he must renew FMLA medical certification by August 13, 2025.

43. On August 4, 2025, Plaintiff was ill and sought to use one hour of FMLA. Plaintiff

alerted Defendant's Leave Administrator and was approved for family medical leave.

44. On August 6, 2025, Plaintiff was again ill and needed to use his intermittent FMLA. Complainant called Defendant's Leave Admin and was approved for 3 hours of FMLA.

45. On August 6, 2025, Plaintiff was summoned to a Teams meeting with Ms. Plowick and Operations Manager, Ms. Kristi Chambers, where Plaintiff was informed that he was being terminated for "attendance". They referenced August 6, 2025 and the previous day Plaintiff called out (August 4, 2025) as violations of the Final Warning issued on June 23, 2025. On both dates, Plaintiff called out and was approved for FMLA by the Leave Admin.

46. Plaintiff's absence on June 18, 2025, his, "final warning," was also approved under FMLA by the Leave Administrator.

47. Plaintiff worked for Defendant for over a decade, and his alleged "issues" with attendance, only came about after Plaintiff sought accommodation to manage his health condition.

48. The loss of healthcare, due to Defendant's retaliatory actions, led to lapses in treatment for his diabetes, as it became unaffordable. This led to a hospitalization on September 22, 2025.

49. Plaintiff has suffered physical, mental, emotional, and financial harm as a result of Defendant's conduct.

## First Cause of Action
## <u>Violations of the Family and Medical Leave Act ("FMLA)</u>
## - Interference and Retaliation –

50. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

51. Plaintiff worked for Defendant for approximately 11 years.

52. Plaintiff worked at least 1,250 hours in the immediate preceding year or which he sought to use family medical leave.

53. At all relevant times, Defendant employed at least 50 employees within 75 miles of Plaintiff's work location for at least 20 calendar weeks.

54. On March 4, 2025, Plaintiff was approved for FMLA benefits.

55. On March 7, 2025, Plaintiff began using FMLA intermittently.

56. On June 18, 2025, Plaintiff was ill and was approved for eight (8) hours of FMLA by Defendant's Leave Admin system.

57. On June 23, 2025, Plaintiff was placed on Final Warning by Ms. Plowick, stating incorrectly that he failed to call out or he had an unapproved absence on June 18, 2025.

58. On August 4, 2025, Plaintiff was feeling ill and was approved for FMLA by the Leave Admin Line. It was for 1 hour.

59. On August 6, 2025, Plaintiff was feeling ill and was approved for FMLA by the Leave Admin Line. It was for 3 hours.

60. On August 6, 2025, Plaintiff was terminated for attendance. Ms. Plowick and Ms. Christie Chambers cited absences June 18, 2025, August 4, 2025, and August 6, 2025, as the reason for termination.

61. On August 4, 2025, and August 6, 2025, Plaintiff was only out for 1and 3 hours respectively.

62. Complainant was terminated for leave taken that was approved as family medical leave by Defendant.

63. Defendant's actions, including but not limited to, harassing Plaintiff over the use of FMLA, terminating Plaintiff for exercising his FMLA rights and considering FMLA-qualifying absences against Plaintiff in its decision to discipline and terminate him; constitute interference and/or retaliation in violation of the FMLA.

64. Defendant's conduct also interfered with- and/or impeded Plaintiff from taken future/prospective family medical leave where Defendant had notice of Plaintiff's request to take additional family medical leave but terminated Plaintiff for exercising his rights under the FMLA.

65. Defendant's violation of the FMLA was willful because it refused to check and ensure its compliance with the FMLA even after these violations were brought to Defendant's attention.

66. Defendant's violation of the FMLA was willful because it knowingly ignored its obligations under the FMLA.

## Second Cause of Action
## Violation of the American with Disabilities Act ( "ADA") - Failure to Accommodate.

67. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

68. Plaintiff was an employee and a qualified person with a disability pursuant to the ADA because he had Type 1 Diabetes, which substantially limited life activities by requiring constant testing and monitoring of blood sugar levels, the self-administering of insulin, frequent visits to the doctor, among other measures.

66. Plaintiff was qualified to perform his job as a Licensed Insurance Agent with accommodation.

67. On or around November 4, 2024, Plaintiff contacted HR to inquire about ADA accommodation as his condition worsened and became increasingly difficult to manage.

68. On December 11, 2024, Plaintiff submitted a written request for accommodation to Defendant's Human Resources Department.

69. On December 18, 2024, Plaintiff submitted a reasonable accommodation form, completed by his treating physician. On it, Plaintiff and his physician requested: 45-minute lunch break and three 15-minute breaks.

70. On January 7, 2025, Plaintiff was notified that his ADA accommodations were approved, which accommodations included: one 45-minute lunch break, three 10-minute breaks, and one day per month to attend doctor's appointments.

71. On February 12, 2025, Plaintiff contacted Ms. Smith to let her know that his ADA accommodations, outlined above, were not being honored by management.

72. On February 13, 2025, Plaintiff's ADA accommodations were amended and approved by Ms. Smith to include: his 45-minute lunch break and three 15-minute breaks.

73. On February 13, 2025, Ms. Smith instructed Plaintiff that he would have to call out to use his additional break, or any time he would go over the normal 2 15-minute break schedule.

74. From March 6, 2025, until July 31, 2025, Complainant was harassed and/or scrutinized by Ms. Plowick and Ms. Chris Lindsey regarding the use of his approved ADA breaks and lunches.

75. On June 6, 2025, Ms. Linsey, contacted Plaintiff informing him he was over on his 10-minute break, wherein he was approved for a 15-minute break.

76. On July 18, 2025, Plaintiff's ADA accommodations finally took effect; albeit he was approved on January 7, 2025, taking just over 6 months.

77. Throughout the relevant time period, Ms. Plowick and Ms. Lindsey knew that Plaintiff had requested assistance and accommodations due to his disability.

78. Ms. Plowick could have provided such accommodations to Plaintiff without unnecessary difficulty and harassment.

79. Plaintiff had a disability within the meaning of the ADA.

80. Plaintiff was a "qualified individual" within the meaning of the ADA.

81. Defendant had knowledge of Plaintiff's disability and his limitations.

82. Plaintiff requested an accommodation.

83. Defendant failed to provide Plaintiff with a reasonable accommodation.

84. Defendant's 6-month delay in accommodating Plaintiff amounted to a denial of Plaintiff's request for accommodation.

85. Defendant's constant harassment of Plaintiff regarding already approved ADA breaks, and resulting discipline constitutes discrimination and retaliation in violation of the ADA solely because of Mr. Harris's disability.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendant is to promulgate and adhere to a policy prohibiting discrimination and retaliation;

B. Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

C. Plaintiff is to be awarded actual damages, as well as damages for the pain, suffering, and humiliation caused by Defendant's actions, as permitted by applicable law;

D. Plaintiff is to be awarded liquidated and/or punitive damages to punish Defendant for its willful, deliberate, malicious, and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future (as permitted under applicable claims/laws);

E. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate;

F. Plaintiff is to be awarded the costs and expenses of this action and a reasonable attorney's fees as provided by applicable federal and state law.

## JURY DEMAND

Plaintiff demands trial by jury.

**ABARA LAW FIRM, PLLC.**

s/ Obinna I. Abara

Obinna I. Abara, Esquire
Attorney I.D., No.: 204964
Abara Law Firm, PLLC
180A Old Swede Rd., #333
Douglassville, PA 19518
oabara@abaralw.com
Phone: 215-360-3260
Attorney for Plaintiff

Date: September 21, 2026